In re William Lynn JONES and Irene Hilton Jones dba Prestige Enterprises, Debtors.

Bankruptcy No. 82C–00407.

United States Bankruptcy Court, D. Utah.

Sept. 16, 1983.

Rulon T. Burton, Burton & Schiess, Salt Lake City, Utah, for debtors.

## MEMORANDUM OPINION

GLEN E. CLARK, Bankruptcy Judge.

The issue in this case is whether cure and compensation payments under 11 U.S.C. § 1124(2) may be made in deferred cash payments commencing after the effective date of a chapter 11 plan. The ruling is that they may not.

## INTRODUCTION

Debtors' chapter 11 plan places two allowed secured claims into separate classes, designated B–2 and B–3. The obligation underlying each claim is in default. The plan intends to cure the defaults and leave these two classes unimpaired by complying with Section 1124(2).

Section 1124(2) provides for curing defaults and leaving classes unimpaired under a chapter 11 plan. A class of claims or interests is not impaired even though there has been a default which, under a contract or applicable law, triggers the right to demand or receive accelerated payment if, with respect to each holder of a claim or interest of that class, the plan

(A) cures any such default, other than a default of a kind specified in section 365(b)(2) of this title,[1] that occurred before or after the commencement of the case under [title 11];

(B) reinstates the maturity of such claim or interest as such maturity date existed before such default;

(C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or applicable law; and

(D) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Debtors plan to pay the money required to cure and compensate for defaults under subsections (A) and (C) by making monthly cash installment payments commencing thirty days after the effective date of the plan.[2] Class B–2 will receive about $1,436.00 in approximately eighteen and one-half monthly payments of $85.00. Class B–3 will receive approximately $7,000.00 in one $5,500.00 payment on the effective date of the plan and the balance in monthly payments of $50.00. Debtors propose to add 12 percent annual interest to the unpaid cure and compensation amounts.

At the confirmation hearing, the court questioned whether the cure and compensation payments specified by Section 1124(2) may be made over time after the effective date of the plan even if sufficient interest is

---

1. Section 365(b)(2) specifies three types of defaults: defaults that are breaches of a provision relating to (1) the insolvency or financial condition of the debtor at any time before the closing of the case; (2) the commencement of a bankruptcy case; or (3) the appointment of or taking possession by a trustee in a bankruptcy case or a custodian before the commencement of a case. These defaults need not be cured under Section 1124(2)(A). It is by no means clear that the right to demand or receive accelerated payment must arise under a contract or a statute. Section 1124(2) uses the term "law" not the term "statute." *In re Madison Hotel Associates,* 29 B.R. 1003 (D.C.W.D.Wis.1983), for example, reads Section 1124(2) too narrowly when it refers to "a right to accelerated payments arising under a contractual provision or statute." 29 B.R. at 1006. *See also* 29 B.R. at 1008: "[C]laims that reflect an automatic statutory or contractual right to acceleration."

2. The plan defines "effective date" as "the date 30 days after the date upon which the order of confirmation is no longer subject to appeal or certiorari proceedings, on which date no such appeal or certiorari proceeding is then pending, and on which date all of the conditions to the effectiveness of the plan expressly set forth in the plan have been satisfied fully or effectively waived." The propriety of such a definition has been questioned. *See* note 13.

added to give present value as of the effective date, or whether those payments must be made on or before the effective date. That issue was taken under advisement and is decided by this memorandum opinion.

## DISCUSSION

Debtors advance two arguments. First, debtors claim entitlement to make their cure and compensation payments over time after the effective date of their plan because the language of Section 1124(2) fixes no time limits for cure or compensation, unlike Section 1322(b)(5) which requires cure of defaults "within a reasonable time," unlike Section 365(b)(1)(A) which requires cure or adequate assurance of prompt cure of defaults "at the time of assumption" of a contract or lease, and unlike Section 1124(3) which requires payment of cash "on the effective date of the plan." *See also* Section 1110(a)(2) (requiring cure of certain defaults under contracts relating to aircraft equipment and vessels within 60 days after the date of the order for relief) and Section 1168(a)(2) (similar provision for contracts relating to rolling stock).

Second, debtors contend that classes designated to receive installment payments for cure and compensation of defaults do not need the protections given by Section 1129(b) because, in debtors' view, the only Section 1129(b) issues raised by this plan are the interest rate necessary to give present value and the feasibility of the plan. Debtors say these issues can be determined at confirmation just as easily under Section 1124(2) as under Section 1129(b). This contention is made in view of the second approach to impairment described in *In re Barrington Oaks General Partnership*, 15 B.R. 952, 963–964 (Bkrtcy.D. Utah 1981), *viz.*, a class is impaired "where necessary to prevent wrongs which are redressable under Section 1129(b)."

In my judgment, debtors' proposal for installment payments after the effective date of their plan, though well-intentioned and arguably not forbidden by the words of Section 1124(2), impairs classes B–2 and B–3. This conclusion is based on an analysis of the plan under the two approaches to impairment explained in *Barrington Oaks.*

The bankruptcy code adopts the concept of "private control [of the reorganization process] with a minimum of judicial intrusion." *Barrington Oaks, supra* at 958. Chapter 11 is "a vehicle to channel negotiation among the parties." Aaron, "The Bankruptcy Reform Act of 1978: The Full-Employment-For-Lawyers Bill Part V: Business Reorganization," 1982 UTAH L.REV. 1, 16. "[T]he reorganization process is not basically an adversary process. The reorganization process is one of controlled negotiation, much like labor negotiations are conducted between labor and management." Trost, "Corporate Reorganization Under Chapter VII of the 'Bankruptcy Act of 1978': Another View," 48 AM. BANKR.L.J. 111, 120 (1974).[3]

Courts, debtors, and creditors should approach reorganization in ways that discourage litigation and promote negotiation. Chapter 11 supplies useful tools which, in the hands of enlightened debtors and creditors willing to substitute bargaining for brawling, can remedy otherwise irreparable financial disasters. Two provisions of chapter 11 which were designed to limit litigation are Sections 1124 and 1129.

■ If all classes of claims and interests accept a chapter 11 plan, the plan's proponent need only satisfy the requirements of Section 1129(a) to secure confirmation of the plan. But if any class is impaired under and has not accepted the plan, the plan's proponent must also prove that the plan meets the specifications of Section 1129(b). Section 1129(b) bars confirmation of a plan impairing a class that has not accepted the plan unless "the plan does not discriminate unfairly, and is fair and equitable."

---

**3.** "Reorganization is seldom primarily the product of the judicial process but, instead . . . arises from persuading many persons with diverse interests to think similarly at the same time." Coogan, "Confirmation of a Plan Under the Bankruptcy Code," 32 CASE WESTERN RES.L.REV. 301, 348 (1982).

Deciding whether a chapter 11 plan does not discriminate unfairly and is fair and equitable is complicated. Kenneth N. Klee, one of the drafters of Section 1129(b), has stated that to understand when a plan may be confirmed over the dissent of a class "involves a tortuous journey through the statute and legislative history that is fraught with complex concepts, terms of art, and innuendoes." Klee, "All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code," 53 AM.BANK. L.J. 133, 136 (1979). Although an intellectual grasp of the statute can be gained by study,[4] applying the statute to particular cases is arduous. Litigation under Section 1129(b) is expensive, time consuming, and unpredictable. In many cases the cost and delay can be fatal to the reorganization. "[T]he patient may die on the operating table while the lawyers are diagnosing." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 229 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6189.

For these reasons, the threat of forcing a hearing under Section 1129(b) is a potent source of creditor power in chapter 11. On the other hand, the power to confirm a plan over the dissent of a class of claims or interests gives the proponent of a chapter 11 plan a significant advantage in negotiating a plan. Thus, "[t]he threat of cramdown ... overshadows the bargaining." *Miller, supra* note 4, at 1076. "Perhaps the principal use of Section 1129(b) will be as a bargaining club which dissidents on the one hand or plan proponents on the other may employ to reach agreement rather than face the trials and tribulations of a section 1129(b) proceeding." Coogan, *supra* note 3, at 362. *See generally* Aaron, *supra* note 4.

Congress interposed the unfair discrimination and fair and equitable tests as safeguards for dissenting impaired classes. At the same time, however, Congress determined that those protections are not needed and that the burdens and risks of a hearing under Section 1129(b) may be avoided for a class not impaired under the plan. Thus, classes left unimpaired by a plan are deemed by Section 1126(f) to have accepted the plan and solicitation of acceptances from holders of claims or interests of those classes is not required.[5]

**4.** A number of commentators have written helpful articles on the operation of Section 1129(b). For example, *see* Aaron, *supra;* Anderson & Ziegler, "Real Property Arrangements Under the Old and New Bankruptcy Acts," 25 LOY.U.L.REV. 713 (1979); Black, "Cram Down on Secured Creditors Under the New Bankruptcy Code," 69 ILL.B.J. 498 (1981); Blum, "The 'Fair and Equitable' Standard for Confirming Reorganizations Under the New Bankruptcy Code," 54 AM.BANK.L.J. 165, (1980); Coogan, *supra* note 3; Epling, "Cramdown Under the Bankruptcy Code of 1978: Effect Upon the Soft Collateral Lender," 12 LOY.U.L.REV. 627 (1981); Fine, "Unjamming the 'Cram-Down,'" 52 AM.BANKR.L.J. 321 (1978); Gordanier, "The Indubitable Equivalent of Reclamation: Adequate Protection for Secured Creditors Under the Bankruptcy Code," 54 AM.BANKR.L.J. 299 (1980); Klee, *supra;* Labovitz, "Outline of 'Cram Down' Provisions Under Chapter 11 of the Bankruptcy Reform Act of 1978," 86 COM. L.J. 51 (1981); Miller, "Bankruptcy Code Cramdown Under Chapter 11: New Threat to Shareholder Interests," 62 BOSTON U.L.REV. 1059 (1982); Pachulski, "The Cram Down and Valuation Under Chapter 11 of the Bankruptcy Code," 58 N.CAR.L.REV. 925 (1980); Trost, "Business Reorganizations Under Chapter 11 of the New Bankruptcy Code," 34 BUS.LAW. 1309 (1979); Comment, "Cram Down Under the New Federal Bankruptcy Code: The Effect of Deemed Acceptance on the Confirmation Standards of Chapter 11," 15 LAND & WATER L.REV. 701 (1980); Note, "From Debtor's Shield to Creditor's Sword: Cram Down Under the Chandler Act and the Bankruptcy Reform Act," 55 CHI.—KENT.L.REV. 713 (1979); *see generally,* 5 COLLIER ON BANKRUPTCY, ¶ 1129 (15th ed. 1983).

**5.** Solicitation of acceptances from members of unimpaired classes, however, is not forbidden. Courts and commentators have asked whether members of unimpaired classes may reject a plan. It is clear that even though a plan specifies that a particular class is not impaired under the plan, that class may argue the issue of impairment. *See, e.g., In re Forrest Hills Associates, Ltd,* 18 B.R. 104 (Bkrtcy.D.Del.1982); *In re Otero Mills, Inc.,* 31 B.R. 185, 10 B.C.D. 1041 (Bkrtcy.D.N.Mex.1983). The disputed issue is whether a class that as a matter of law is not impaired under Section 1124 may nevertheless vote against the plan. *In re Marston Enterprises, Inc.,* 13 B.R. 514 (Bkrtcy.E.D.N.Y.1981), contrasted legislative statements about Sections 1126(f) and 1126(g) and concluded that the presumption of acceptance under 1126(f) for an unimpaired class is rebuttable by a class rejection. *See also In re Spirited, Inc.,* 23 B.R.

Debtors, anxious to avoid the perils of a Section 1129(b) hearing, may wish to use Section 1124 to leave unimpaired as many classes as possible. Classes of claims or interests, hoping to have the protection and leverage given by Section 1129(b), may desire to be found impaired under Section 1124.

Debtors may also wish to create unimpaired classes under Section 1124(2) because

it enables reversal of contractual or legal acceleration and retention of advantageous contract terms. "Curing of the default and the assumption of the debt in accordance with its terms is an important reorganization technique for dealing with a particular class of claims, especially secured claims." S.Rep. No. 95–989, 95th Cong., 2d Sess. 120 (1978) U.S.Code Cong. & Admin.News 1978, p. 5906.[6] *But see In re Taddeo, supra* note

1004 (Bkrtcy.E.D.Pa.1982). *Barrington Oaks, supra,* recognized but did not, as Coogan suggests, decide the issue. *See* 15 B.R. 959 n. 18, 967 n. 35, 968 n. 38; Coogan, *supra* note 3, at 340, 351. Indeed the issue could not have been decided because the court found that the class in question was impaired. It may be possible to read Section 1126(f) to mean what it says and still permit holders of claims or interests in unimpaired classes to vote. For example, it might be argued that Section 1126(f) deems a class to accept a plan only for purposes of Section 1129(a)(8)(A) and that individual members of an unimpaired class may object to confirmation on grounds that the plan does not satisfy Section 1129(a)(1), (2), (3), (4), (5), (6), (7), (9), (10), or (11). Section 1126(a) and Bankruptcy Rule 3018(a) permit the holder of an allowed claim or interest to accept or reject a plan without excluding members of unimpaired classes. Section 1109(b) permits any party in interest to raise and appear and be heard on any issue in a chapter 11 case. The Bankruptcy Rules require mailing of a plan and disclosure statement to all holders of claims or interests without excluding members of impaired classes. *See* Rule 3017(d). The language of Section 1126(f) deems a class, not members of the class, to have accepted the plan. *See Barrington Oaks, supra* at 967–968 n. 35. Thus, broad statements such as "[S]ection [1124] determines who has the right to vote on a Chapter 11 plan," *In re Taddeo,* 685 F.2d 24, 28 (2d Cir.1982) (dictum), may be inaccurate. *See also In re Madison Hotel Associates, supra* note 1, at 1006: "A finding of impairment or nonimpairment determines a creditor's right to vote on a reorganization plan." But the force of this argument has not been tested in this district. *See* note 6, *infra.*

**6.** If the argument that members of unimpaired classes may object to confirmation on grounds that the plan does not satisfy Section 1129(a)(1), (2), (3), (4), (5), (6), (7), (9), or (10), *see* note 5, *supra,* were accepted without qualification, the effectiveness of Section 1124(2) as a reorganization tool might be seriously undermined. COLLIER BANKRUPTCY PRACTICE GUIDE (1982), explains the issues and ventures an answer: "It is an open issue under the Code whether a 'deemed acceptance' binds only the particular class or each holder included in such

class. The effect of that issue on the 'best interests' test of section 1129(a)(7) may be crucial, since unless each holder is deemed to have accepted the plan, that section would be applicable and would require an analysis of the plan, including the determination of whether each holder included in that class is entitled to postpetition interest on its claim." ¶ 90.07[2] at 90–115; *See also* ¶ 90.10[4] at 90–171. "Another interesting issue is raised by the provisions of section 1124. Under sections 1124(1) and (2), essentially, a class of claims or interests which is left in place unaffected is unimpaired and is deemed to have accepted the plan. If the terms of a class of claims or interests are beneficial to the debtor, such as deferred maturities or a low coupon relative to current rates, the debtor might seek to leave them in place unimpaired. However, if the seniority position or security covering such claim or interest is such that on a liquidation they would be entitled to receive cash or property having a value greater than the present value of the instrument held by them, is a 'best interests' question raised? The answer should be in the negative, because there is no damage to the class by virtue of the financial condition of the debtor, and a bankruptcy proceeding should not be the occasion for the enhancement of a position at the expense of others. The Code, however, is not clear on this point." ¶ 90.10[4] at 90–172. The court in *In re Los Altos Hotel Associates,* Case No. 5–81–01943 (N.D.Cal.), in an unpublished order dated December 29, 1981, held that the holder of the claims in two unimpaired classes could object to confirmation on the ground that the plan failed to satisfy Section 1129(a)(7)(A)(ii). The notes underlying the claims in the two unimpaired classes bore a 10 percent annual interest rate. Professor Triester argues that this holding "if followed generally, would take away the usefulness from the debtor's standpoint of the non-impairment concept in the case of low interest bearing claims." Triester, Recent Bankruptcy Decisions, Opinions Reported in Various Services, May 1982—January 1983, at 392. *Compare* Jackson, "Bankruptcy, Non-Bankruptcy Entitlements, and the Creditors' Bargain," 91 YALE L.J. 857, 882 n. 117 (1982). (While Sections 1124(2), 1129(a)(7), and 1126(f)

5, at 29 (The authority to cure is found in Section 1123(a)(5)(G) not in Section 1124(2)); *Accord, In re Madison Hotel Associates, supra* note 2, at 1007. But creditors who are parties to agreements a debtor wishes to reinstate under Section 1124(2) may argue they are impaired in order to escape a contract with terms favorable to the debtor. Section 1124 and its interpretation therefore occupy a pivotal position.[7]

*Barrington Oaks, supra,* offers two approaches to impairment. The first examines the plan in light of the language and purpose of Section 1124 and strictly construes Sections 1124(1) and (2) to find impairment whenever the plan alters rights in any way not expressly permitted by Sections 1124(1) and (2).[8] The second scrutinizes the plan's treatment of the affected classes in light of the protections provided by Section 1129(b) and finds impairment "where necessary to prevent wrongs which are redressable under Section 1129(b)." 15 B.R. at 964. Debtors' plan impairs the two classes designated to receive installment payments of cure and compensation money under either approach.[9]

## Impairment Under The First Approach

Classes B–2 and B–3 are impaired under the first approach to impairment of *Barrington Oaks* because the imposition of installment payments to cure and compensate for defaults is an expansion of the permissible alterations intended under Section 1124(2). Debtors' proposal collides, in several particulars, with the intended use and effect of Section 1124. Senate Report 95–989, U.S.Code Cong. & Admin.News 1978, p. 5906, *supra,* explains Section 1124(2) as follows:

> [A] claim or interest is unimpaired by curing the effect of a default and reinstating the original terms of an obligation when maturity was brought on or accelerated by the default. The intervention of bankruptcy and the defaults represent a temporary crisis which the plan of reorganization is intended to clear away. The holder of a claim or interest who under the plan is restored to his original position, when others receive less or get nothing at all, is fortunate indeed and has no cause to complain.[10]

may be read to mean that members of unimpaired classes are deemed to accept the plan for purposes of Section 1129(a)(7)(A)(i), the drafting of Section 1129(a)(7) "leaves open a contrary possibility.... § 1126(f) deems an unimpaired *class* to 'have accepted the plan.' ... § 1129(a)(7)(A) refers to *individual* claim holders.... § 1126(f) does not say that each claim holder has accepted the plan, only that the *class* has. Therefore, it is open for an individual claimant in any unimpaired class to argue that he is, nonetheless, entitled to the protection of Bankruptcy Code § 1129(a)(7)(A). This argument becomes difficult (albeit conceptually *still possible*) when the class consists of only one creditor, as is normally the case with respect to security interests.") (emphasis in original).

7. Collier suggests two other incentives to create unimpaired classes. First is saving administrative expenses because solicitation of acceptances from the members of unimpaired classes is not required. Second is the simplicity Section 1124 offers to a plan. COLLIER *supra* note 4, ¶ 1124.03 at 1124–11 to 1124–12. The cost saving incentive, however, may be insignificant if plan proponents must mail plans and approved disclosure statements to unimpaired classes, *see* note 5, *supra,* because

that mailing usually contains the ballot. *See also* Bankruptcy Rule 3017(d).

8. The arguments of the affected class in *Barrington Oaks* were directed toward Sections 1124(1) and (2). 15 B.R. at 955. The court's discussion of alteration of rights expressly focuses on Sections 1124(1) and (2). 15 B.R. at 961–963. In some respects, Section 1124(3) may be an exception to the rules and policies of Sections 1124(1) and (2). 15 B.R. at 963 n. 24.

9. Like *Barrington Oaks,* this case need not resolve the question there left unanswered, namely, "whether the two approaches [to impairment] are optional in any case or mutually exclusive in all cases." 15 B.R. at 967. The facts of this case "permit a holding of impairment under both approaches." *Id.* Indeed, debtors' arguments invite the application of both approaches.

10. This justification of Section 1124 may not be wholly comforting to creditors in some cases. A class may be impaired in fact and yet not be impaired in law under Section 1124. *See In re Rolling Green Country Club,* 26 B.R. 729, 735. (Bkrtcy.D.Minn.1982). Nonimpairment under Section 1124 may not mean that a class receives all of its legal rights. Examples of this troublesome policy aspect of Section 1124 are discussed in *Coogan supra* note 3, at 327 n.

While it may be argued that Section 1124(2) does not expressly require claim or interest holders to be restored to their original positions by the effective date of the plan, a better interpretation is that "Section 1124(2) requires that the curing of the default occur as of the effective date of the plan because the creditor is impaired until the time the default is cured." *In re Otero Mills, Inc., supra* note 5, at 1042. Several reasons recommend this interpretation.

Debtors' proposal encourages wasteful litigation over the timing, methods, and effects of cure and compensation under Section 1124(2). The absence of guidelines for the timing of post-effective date payments would multiply litigation. For example, if debtors' proposal for cure and compensation over approximately eighteen months with respect to class B–2 were permissible, what of cure and compensation over twenty-four, thirty-six, or forty-eight months? The court would have no standards by which to decide the issue, causing the proper cure period under Section 1124 to expand and contract without a controlling statutory rationale. Section 1124 is supposed to be a measuring rod for impairment. *Barrington Oaks, supra* at 959 n. 19. A measuring rod with inconstant increments, changing between measurements, is useless. Thus, Section 1124 should be strictly construed.

Methods for leaving a class unimpaired under Section 1124 should be exclusive. The non-limiting terms "includes" and "including" do not precede Section 1124's list of options. A class is impaired unless the plan provides one of the three specified alternative treatments. From the outset, parties know that any plan specifying a class as unimpaired must give one of only three treatments. No creativity, with resulting unpredictability, is permitted. Debtors' proposal, if accepted, would broad-

en the terms "cures" and "compensates" under Sections 1124(2)(A) and (C) and thus create ambiguity and invite disputes.

Section 1124 is meant to be definitive. A class is either impaired or not. There is no middle ground. The uncertainties of former law, with its reference to "material" and "adverse" effects, are abolished. The change from "material" and "adverse" effect to Section 1124's three options avoids disputes over degree and direction of the workings of a plan. Section 1124 should establish, as nearly as possible, a bright line test for impairment. "Impairment," explains Norton, "is carefully defined in the Code—an improvement over the Act which failed to furnish any guidelines as to when a claim or interest was materially affected." 3 NORTON BANKRUPTCY LAW AND PRACTICE § 62.05 at 8 (1981). The code furnishes "concrete rules ... [and therefore] [t]here should be no difficulty in applying [Section 1124's] standard." *Id.* at § 62.06.[11] Debtors' proposal would cloud the certainty of Section 1124 by requiring the court to inquire into the effects of delay of cure and compensation.

Finally, debtors' proposal encourages litigation over the value of the deferred payments. Section 1124 is designed to be free, for the most part, of disputes over valuation. As explained in *Barrington Oaks, supra* at 962–963, "Value ... is irrelevant under Section 1124; 'any alteration of rights constitutes impairment even if the value of the rights is enhanced.'" [Citing 5 COLLIER ON BANKRUPTCY, *supra* at ¶ 1124.03(1) at 1124–12 and 1124–14 and Klee, *supra* at 140 n. 55]. "Indeed, the purpose of Section 1124 to avoid cramdown would be defeated by requiring valuation of claims to determine impairment. By driving a wedge between the concept of impair-

---

123, 336–340 and Fortgang and King, "The 1978 Bankruptcy Code: Some Wrong Policy Decisions," 56 N.Y.U.L.REV. 1148, 1154–1165 (1981). For other criticisms of Section 1124(2) *see* Jackson, *supra* note 6, at 881–887.

**11.** Other analysts have noticed the clarifying change Section 1124 makes from former law. *See* Fortgang and King, *supra* note 10, at 1154.

But some have complained of the "less than lucid language" of Section 1124(2). Trost, *supra* note 4, at 1332–1333 ("The meaning of clauses (C) and (D) are beyond the comprehension of this author."). Coogan illustrates possible difficulties in interpreting Section 1124. Coogan, *supra* note 3, at 336–344. Despite these defects, Section 1124 is an improvement over former law.

ment and the vagaries of value, parties may know with greater certainty whether or not they are impaired. This certainty should reduce litigation and aid negotiation toward a plan, the goals which Section 1124 was established to further." The history of the congressional development of Section 1124 illustrates the drafters' "aversion to valuation hearings." *Id.* at 963 n. 24. Thus, courts should, where possible, construe Section 1124 to eliminate the obscurities of valuation. Debtors' proposal would require the court to value the deferred cash payments. This would necessitate a determina-

tion of the appropriate interest rate, a concept which, like value in bankruptcy cases, has proven itself to be "an elusive Pimpernel." *In re Jones,* 5 B.R. 736, 738 (Bkrtcy. E.D.Va.1980).[12]

For these reasons Section 1124(2) should be construed to require completion of cure and compensation by the effective date of the plan. While the term "effective date" is subject to interpretation,[13] requiring cure and compensation by the effective date of the plan would minimize litigation over timing, method, and effect of cure and compensation, conform Section 1124(2) to Section

**12.** Few other issues under the bankruptcy code have produced so many opinions with such varied results as has the issue of the appropriate interest rate for determining present value. Chapter 11 cases include *In re Southern States Motor Inns, Inc.,* 709 F.2d 647 (11th Cir.1983); *In re Bay Area Services,* 26 B.R. 811 (Bkrtcy.M. D.Fla.1982); *In re Moore,* 25 B.R. 131 (Bkrtcy. N.D.Tex.1982); *In re Tacoma Recycling, Inc.,* 23 B.R. 547 (Bkrtcy.W.D.Wash.1982); *In re Sullivan,* 26 B.R. 677 (Bkrtcy.W.D.N.Y.1982); *In re Patel,* 21 B.R. 101 (Bkrtcy.M.D.Fla.1982); *In re Nite Lite Inns,* 17 B.R. 367 (Bkrtcy.S.D. Cal.1982); *In re Burgess Wholesale Manufacturing Opticians,* 16 B.R. 733 (Bkrtcy.N.D.Ill. 1982); and *In re Landmark at Plaza Park, Ltd.,* 7 B.R. 653 (Bkrtcy.D.N.J.1980). There are more than fifty chapter 13 cases. Their relevance in the chapter 11 context, however, is an issue not yet resolved. Many factors may make the complexion of the risk in a chapter 13 case different from the risk in chapter 11. Nevertheless, the chapter 13 cases have broken important analytical ground. Most of the chapter 13 cases can be found in the citations in *In re Fisher,* 29 B.R. 542 (Bkrtcy.D.Kan.1983) and *In re Evans,* 20 B.R. 175 (Bkrtcy.E.D.Pa. 1982).

**13.** The phrase "effective date of the plan" is not defined by the code. Thus, the outside limits on the effective date of a plan are somewhat hazy. A rule of reason is probably the best rule. *See* NORTON *supra* § 62.06, at 12 (1980); *In re Rolling Green Country Club, supra* note 10, at 735. Klee, *supra* at 137 n. 24 suggests that the effective date of a plan "usually would be the first day after which the order of confirmation becomes final." Under the Bankruptcy Rules, that date is 11 days after the entry of the order of confirmation if there is no appeal. *See* Bankruptcy Rule 8002. But Pachulski, *supra* note 4, at 934 n. 40 criticizes this suggestion because it "would make it impossible ... to make any of the valuations that may become necessary in order to determine whether the plan can be confirmed, because the likelihood of an appeal ... and the date when

the appeal will be resolved cannot be determined in advance of confirmation." He says the effective date "should probably conform to the date the plan is confirmed, because the plan becomes 'effective' to the extent of eliminating creditor and stockholder rights not preserved in the plan upon confirmation. *See* 11 U.S.C. § 1141 ... On the other hand, the choice of the term 'effective date' rather than 'confirmation date' suggests that the two need not invariably coincide, and that the plan might designate some other effective date." Pachulski's comments are persuasive. The entry of an order confirming a chapter 11 plan has far-reaching statutory effects independent of the effective date of the plan. *See* §§ 347(b) and 1143, 362(c), 365(b)(2), 524, 1104, 1105, 1106(a)(7) and Rule 2015(a)(5), 1112(b)(7) and (8), 1112(d), 1129(c), 1141, 1142, and 1144. *See also* Bankruptcy Rules 2015(a)(5), 3020(c), 3021, 4008, and 8002(a); Hopper, "Confirmation of a Plan Under Chapter 11 of the Bankruptcy Code and the Effect of Confirmation on Creditors' Rights," 15 IND.L.REV. 501 (1982). This fact supports placing the effective date on or close to the date of the entry of the order confirming the plan. "The effective date of the plan" is expressly designated as the critical point for the major financial standards for confirmation. *See* §§ 1129(a)(7), 1129(a)(9), 1129(b). The valuations required by these sections are likely to be less accurate if the effective date is not close to the date of the hearing on confirmation. As a practical matter, it may not be possible in some cases to make the effective date the same date as the date of the hearing on confirmation because some claims may not have been allowed by then. For example, administrative claims covered by Section 1129(a)(9)(A) may remain unallowed or objections to claims may be unresolved. *See* Hopper, *supra* at 517. It is difficult to combine these considerations into a rule more precise than that the effective date of the plan should be reasonably close to the date of the confirmation hearing.

1124(3) which requires payment on the effective date of the plan, and shift litigation over present value to Section 1129(b) where it belongs.

*Impairment Under the Second Approach*

Debtors' plan impairs classes B–2 and B–3 under the second approach to impairment of *Barrington Oaks*. Because the plan proposes deferred cash payments, both classes need the protection of Section 1129(b). Section 1129(b) was intended to test deferred cash payments. Debtors' plan would permit Section 1124(2)'s use as a cram down device without shielding the affected classes from unfair or inequitable treatment, a use of Section 1124 which was both anticipated and disapproved by the drafters of Section 1124.

Section 1124 was not intended for use as a tool for cram down. An illustration is Section 1124(3)'s requirement of payment in cash. One early version of Section 1124(3) would have permitted payment in cash or property having a present value equalling cash. H.R. 8200, 95th Cong., 1st Sess. § 1124(3) (1977); S. 2266, 95th Cong., § 1124(3), as introduced (Oct. 29, 1977). Payments over time were permitted if they had a value as of the plan's effective date equal to the allowed amount of the claim or interest. *See* H.R.Rep. No. 95–595, *supra* at 408.

At hearings held before a Senate subcommittee, witnesses criticized proposed Section 1124(3) for not requiring prompt cash payment. *See* statement of Robert J. Grimmig, Senior Vice President, Chemical Bank, and Member, American Bankers Association's Bankruptcy Task Force, *Hearings Before the Subcommittee on Improvements in Judicial Machinery of the Commission on the Judiciary on S. 2266 and H.R. 8200,* 95th Cong., 1st Sess. 577, 579 (1977); Memorandum of the National Association of Real Estate Investment Trusts, *Hearings, supra* at 270. After these hearings, the Senate Judiciary Committee favorably reported S. 2266 with amendments to Section 1124(3) requiring "cash payments." According to Collier,

[T]he language of the Senate amendment was intended to prevent Section 1124(3) from being used as a form of cram down. This was possible because the House bill [H.R. 8200] did not require payment of claims in cash, but rather permitted a claim to be unimpaired if the holder of the claim received 'full' payment in property, other than securities of the debtor. Since 'property' as used in the House Bill included all forms of property including evidence of debt, and since commercial notes were excluded from the definition of security, it could be argued that a secured creditor receiving an unsecured commercial note of a value, as of the effective date of the plan, equal to the allowed amount of its secured claim, would be unimpaired and thus not entitled to vote against the plan or to the protection afforded under Section 1129(b).

COLLIER *supra* note 4, ¶ 1124.01 at 1124–3. *See also* S.Rep. No. 95–989, *supra* at 120, U.S.Code Cong. & Admin.News 1978, p. 5906. ("Section 1124 does not include payment 'in property' other than cash. Except for a rare case, claims or interests are not by their terms payable in property, but a plan may so provide and those affected thereby may accept or reject the proposed plan. They may not be forced to accept a plan declaring the holders' claims or interests to be 'unimpaired.' "). Section 1124(3) was amended again before its enactment. One amendment underscored the requirement of cash in full on the effective date of the plan by changing the words "cash payments" to "cash."

These amendments manifest congressional intent to prohibit deferred cash payments under Section 1124(3) and thus to prevent dissenting classes from being forced to accept deferred cash payments, even if of a present value equal to their claims or interests, without being given sanctuary against unfair discrimination or unfair or inequitable treatment. Section 1124(2) should be construed to prevent its use as a cram down device by permitting forced non-contractual time payments. Section 1124(2), like Section 1124(3), does not protect against unfair

discrimination or require fair and equitable treatment. Surely Congress did not intend to permit under Section 1124(2) the same injury it prevented when it narrowed Section 1124(3).

Although debtors propose, in effect, to amend Section 1124(2) to permit the affected classes to litigate feasibility and present value under Section 1124(2), that power is reserved to Congress.[14] *Accord, In re Otero Mills, Inc., supra* at 1042.

## CONCLUSION

Classes B–2 and B–3 are impaired under debtors' plan. Cure and compensation required by Section 1124(2) must be completed by the effective date of the plan if impairment is to be avoided. Debtors may treat classes B–2 and B–3 in the same manner proposed in the plan but, if they desire to do so, must amend the plan to specify that classes B–2 and B–3 are impaired and permit them to vote.

**14.** Moreover, even if these proposals were judicially grafted onto Section 1124(2), the full protection afforded by Section 1129(b) would still be lacking. The fair and equitable standard includes more elements than those listed in Sections 1129(b)(2)(A), 1129(b)(2)(B), and 1129(b)(2)(C). Because Section 1129(b)(2) uses the non-limiting term "includes," the alternatives listed in subsections (A), (B), and (C) of Section 1129(b)(2) are not safe harbors for meeting the fair and equitable test. "Fair and equitable" is a term of art which carries with it decades of judicial interpretation. *See* Trost, *supra* note 4, at 1334. Congress clearly intended to transfer some of the judicial gloss placed on the fair and equitable test under former law into the fair and equitable test under Section 1129(b). An example of an uncodified element of the fair and equitable test is that "a dissenting class should be assured that no senior class receives more than 100 percent of the amount of its claims." 124 CONG.REC.H. 11,103 (Sept. 28, 1978); S. 17,420 (Oct. 6, 1978). Other requirements may apply. *See, e.g., In re Lloyd Hendricks,* Bankr. No. 82M–00590, unpublished transcript of ruling at 29 (Bk.D.Utah May 17, 1983). (The requirement under former law that classes required to take a lower grade of interest are entitled to receive some compensation or bonus for that reduction in rights is part of the fair and equitable test.) *See also* Black, *supra* note 4, at 499; Blum, *supra* note 4, at 166; Carr, "When Can the Owners Participate in the Reorganized Debtor?: Cram Down as a 'Shield' for Creditors," 15 IND.L.REV. 547, 551–552 (1982); Coogan, *supra* note 3, at 355–362; Klee, *supra,* at 142; Miller, *supra* note 4, at 1063 n. 31; Pachulski, *supra* note 4, at 944–945; Trost, *supra* note 4, at 1344. Post-effective date installment payments over a long period of time, such as those proposed by debtors' plan, may implicate elements of the fair and equitable standard other than those debtors would permit the two affected classes to litigate. And because Congress wrote none of the safeguards of Section 1129(b) into Section 1124, debtors' plan deprives classes B–2 and B–3 of statutory protection.