**In the Matter of BOSTON POST ROAD LIMITED PARTNERSHIP aka Boston Post Limited Partnership, Debtor.**

**Bankruptcy No. 2–91–03498.**

United States Bankruptcy Court, D. Connecticut.

Oct. 2, 1992.

James C. Graham and Sean W. Gilligan, Pepe & Hazard, Hartford, Conn., for F.D.I.C., Receiver for the New Connecticut Bank and Trust Co., N.A., f/k/a The Connecticut Bank and Trust Co., N.A., objecting creditor.

S. Joel Suisman and Andrew J. Brand, Suisman, Shapiro, Wool, Brennan & Gray, P.C., New London, Conn., for debtor.

## MEMORANDUM OF DECISION AND ORDER RE: OBJECTION TO CONFIRMATION OF PLAN

ROBERT L. KRECHEVSKY, Chief Judge.

### I.

At a chapter 11 confirmation hearing on a debtor's plan, a creditor appeared and

objected to confirmation, contending, *inter alia,* that the debtor gerrymandered classes in the preparation of its plan of reorganization.[1] The court, for reasons that follow, concludes that the plan's classification of creditors is improper and that no truly-impaired class, which does not include insiders, has voted to accept the plan. Accordingly, the objection is sustained and confirmation of the plan denied.[2]

## II.

## BACKGROUND

Boston Post Limited Partnership, the debtor, was formed in 1984 to acquire and manage a residential and office complex located at 161 Boston Post Road in Waterford, Connecticut (the property). The debtor, on March 17, 1988, mortgaged the property to Connecticut Bank and Trust Company (CBT) to secure a loan of $1,600,000. The debtor thereafter defaulted in the mortgage payments, and CBT, on July 20, 1990, started a mortgage-foreclosure action in state court. CBT itself, on January 6, 1991, had its assets seized by the United States Comptroller of Currency, and The Federal Deposit Insurance Corporation (FDIC) became the holder of the debtor's mortgage.

The FDIC pursued the foreclosure action and, on August 1, 1991, the Connecticut Superior Court entered a judgment of strict foreclosure, setting October 28, 1991 as the debtor's law day for redemption. On that date, the debtor filed a chapter 11 petition in this court.

The debtor's Second Amended Plan of Reorganization (Plan) contains seven classes. In relevant part, the Plan proposes to pay over a six-year term without interest unsecured trade creditors (Class 4) whose claims, not counting insiders, total about $5000; to pay the FDIC's $500,-000.00 mortgage deficiency claim (Class 5) without interest following the earlier of a sale of the property or the fifteenth year following plan confirmation;[3] and to pay the FDIC's $1,445,000 secured Claim (Class 2) over a 15–year term, utilizing negative amortization with a balloon payment at the end of the fifteenth year following confirmation. The Plan places the debtor's sole limited partner in Class 6, and the debtor's sole general partner in Class 7. Class 3 includes residential tenants of the property who have placed security deposits with the debtor. The Plan provides that Class 3 members shall receive interest on their security deposits at the annual rate of 8%, rather than the 5¼% rate mandated by Conn.Gen.Stat. § 47a–21.[4] The Plan describes all classes as impaired. (Class 1 has turned out to be a class without any members.).

The parties agree, that for the purposes of the confirmation hearing, the property has a value of $1,445,000, and that the FDIC's debt totals about $1,945,000. As a result, the Class 5 FDIC unsecured claim is approximately $500,000, with the Class 3 FDIC secured claim equalling $1,445,0000.

The members of Class 3 (tenants), Class 6 (limited partner) and Class 7 (general partner) voted to accept the Plan. The FDIC, as the sole member of Classes 2 and 4, voted to reject the Plan.

The FDIC's objection contends that Class 3 is not a validly-impaired class, and that the trade-creditor votes in Class 4 and the FDIC's vote in Class 5 should have been combined as creditors holding substantially

---

1. Code § 1128. *Confirmation hearing.*
   (a) After notice, the court shall hold a hearing on confirmation of a plan.
   (b) A party in interest may object to confirmation of a plan.

2. The debtor and creditor agreed at the confirmation hearing to submit the issues discussed *infra* to the court for a ruling. If the court had determined all issues in favor of the debtor, the confirmation hearing would have reconvened.

3. During the hearing on approval of the debtor's disclosure statement, the FDIC chose not to make a Code § 1111(b)(2) election, thereby allowing its claim to be divided into secured and unsecured segments. *See* Fed.R.Bankr.P. 3014.

4. Conn.Gen.Stat. § 47a–21 contains detailed provisions designed to safeguard security deposits paid by tenants to landlords by requiring the landlord to place such deposits in segregated escrow accounts at banks to accrue interest for the benefit of the tenant. The statute contains civil and criminal penalties for its violation.

similar unsecured claims, in which case the FDIC's negative vote of $500,000 would have resulted in a negative vote for the class of unsecured creditors.[5] If this is so, the FDIC asserts, no impaired class of non-insiders would have accepted the Plan, thereby requiring that confirmation of the Plan be denied. *See* Code § 1129(a)(10) ("The court shall confirm a plan only if ... at least one impaired class of claims that is impaired under the plan has accepted the plan, determined without including any acceptances of the plan by any insider.").

## III.

## DISCUSSION

### A.

### *Class 3 Does Not Constitute An Impaired Class*

■ The Plan provides that the security deposits placed by the residential tenants with the debtor receive additional annual interest of 2¾% above that statutorily mandated for such deposits. In no other respect are the tenant's rights affected. This additional interest, according to the debtor, impairs these Class 3 members under the definition of impairment contained in Code § 1124(1):

... a class of claims or interests is impaired under a plan unless, with respect to each class or interest of such class, the plan—

(1) leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder of such claim or interest;

The debtor argues that by paying more interest on the security deposits than required by law, the members of Class 3 have had their interests altered, and thus impaired. In support of this contention, the debtor cites *In re Club Assocs.*, 107 B.R. 385 (Bankr.N.D.Ga.1989); *In re Jones*, 32 B.R. 951 (Bankr.D.Utah 1983); *In re Barrington Oaks Gen. Partnership*, 15 B.R.

952 (Bankr.D.Utah 1981); and 5 *Collier on Bankruptcy* 1124.03 at 1124–13 (15th Ed. 1992) as standing for the proposition that any alteration in the rights of a creditor, including giving the creditor additional benefits, constitutes impairment.

The debtor's reliance on these authorities is misplaced. None of the cited holdings, nor *Colliers*, supports the proposition claimed by the debtor. In *In re Club Assocs.*, *supra*, a plan modified a secured creditor's claim by extending the maturity date of a promissory note, requiring written notice of default, and by giving the debtor an opportunity to cure such default. The court determined such alterations impaired the creditor's claim. The holding contains no discussion of whether additional interest payments to a creditor constitute impairment. *In re Jones*, *supra*, and *In re Barrington Oaks Gen. Partnership*, *supra*, are similarly inapposite. Although *Colliers*, *supra*, does contain the statement "[n]ote that any alteration of rights constitutes impairment even if the value of the rights is enhanced", there is no elaboration. Whatever the reach of such statement, it does not apply to the present matter. The tenant's rights here are unaffected. The tenants have been, and hereafter will be, entitled to the return of their segregated security deposits plus 5¼% accrued interest upon their vacating the property.

The debtor unconvincingly asserts that it wishes to pay the additional interest of 2¾% "as a marketing tool" to maintain present tenants and attract new ones. *Debtor's Reply Brief*, at 11. I conclude that to provide for additional interest to be paid on tenants' security deposits in order to create an impaired class is to turn the doctrine of impairment (as well as that of classification, *see* section B *infra*) on its head and is totally impermissible. If the debtor were correct, as the FDIC points out, any time a plan proponent needed an impaired class for a favorable vote, the debtor would simply add $1.00 to such class

---

5. Code § 1126. *Acceptance of plan.*

. . . . .

(c) A class of claims has accepted a plan if such plan has been accepted by creditors, ...

that hold a least two-thirds in amount and more that one-half in number of the allowed claims of such class held by creditors ... that have accepted or rejected such plan.

members' claims—a transparent and unacceptable stratagem.

### B.

*Classification of The FDIC's Unsecured Claim Separate From Unsecured Claims of Trade Creditors Is Improper*

■ Code § 1122 governs the classifications of claims and reads in full as follows:

(a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

Case law has established that § 1122 does not, *per se*, prevent classification of substantially similar claims in separate classes. *See, e.g., Barnes v. Whelan,* 689 F.2d 193, 201 (D.C.Cir.1982) ("[S]ection 1122(a) does not prohibit [the debtor] from grouping his unsecured obligations according to whether or not a codebtor is present."). The courts, however, have uniformly prohibited a debtor from classifying similar claims differently in order to gerrymander an affirmative vote in favor of a reorganization plan. "[T]here must be some limit on a debtor's power to classify creditors in such a manner. The potential for abuse would be significant otherwise. Unless there is some requirement of keeping similar claims together, nothing would stand in the way of a debtor seeking out a few impaired creditors (or even one such creditor) who will vote for the plan and placing them in their own class." *In re U.S. Truck Co., Inc.,* 800 F.2d 581, 586 (6th Cir.1986). *See also In re Bryson Properties, XVIII,* 961 F.2d 496, 502 (4th Cir. 1992), *petition for cert. filed,* 61 U.S.L.W. 3061 (U.S. July 16, 1992) (No. 92–108); *In re Greystone III Joint Venture,* 948 F.2d 134, 139 (5th Cir.1991) (as amended), *petition for cert. filed,* 60 U.S.L.W. 3843 (U.S.

May 27, 1992) (No. 91–1902); *In re Holywell Corp.,* 913 F.2d 873, 880 (11th Cir. 1990).

In the Plan before the court, the debtor had placed the FDIC's unsecured claim of $500,000 in a class separate from the class of unsecured-trade-creditor claims whose claims total $5,000. To support such separate classification, the debtor argues that (1) the trade-creditors' claims are dissimilar to the FDIC's deficiency claim because the trade creditors' claims arose from the operation of the debtor's business, not from the decline in value of the property; and (2) if the trade creditors are not afforded special treatment, they may not do business with the debtor in the future. *See Debtor's Reply Brief* at 21–22.

In situations involving chapter 11 debtors, where one lender holds an unsecured deficiency claim that dominates the vote of the unsecured creditors, the overwhelming weight of authority holds that it is improper to classify separately the unsecured deficiency claim. *Greystone III, supra,* is the leading case explicitly rejecting both of the contentions made here by the debtor to support separate classification.

In *Greystone III,* the debtor's only significant asset was an office building valued at $5,825,000 encumbered by a mortgage lien of $9,325,000. The debtor's trade creditors held claims of about $10,000. The plan classified the unsecured deficiency claim separately from the claims of the trade creditors, the debtor arguing that separate classification was founded on a "legal difference" between the two types of claims. The secured creditor, under Texas law, had no personal recourse against the debtors. Under Code § 1111(b), however, the undersecured creditor was able to elect recourse status and, thus, vote as an unsecured creditor. The debtor contended that the unsecured deficiency claim thus arose by statute unlike the claims of the trade creditors. *Greystone III* rejected this analysis. "The State law distinction between Code-created unsecured deficiency claims and other unsecured claims does not alone warrant separate classification." *In re Greystone III,*

948 F.2d at 140. In response to the debtor's additional argument that "realities of the business" justify separate classification and different treatment, the court stated: "There is no evidence in the record of a limited market in Austin for trade goods and services. Nor is there any evidence that Greystone would be unable to obtain any of the trade services if the trade creditors did not receive preferential treatment under the plan." *Id.* at 141. *See also In re Lumber Exch. Bld. Ltd. Partnership,* 968 F.2d 647, 649–50 (8th Cir.1992); *In re Bryson Properties, XVIII,* 961 F.2d at 501–02; *In re Washington Assocs.,* 141 B.R. 275, 282–87 (Bankr.E.D.N.Y.1992); *In re Cantonwood Assocs. Ltd. Partnership,* 138 B.R. 648, 653–57 (Bankr.D.Mass.1992); *Piedmont Assocs. v. Cigna Property & Casualty Ins.,* 132 B.R. 75, 78 (N.D.Ga. 1991); *In re Waterways Barge Partnership,* 104 B.R. 776, 783–86 (Bankr. N.D.Miss.1989); *In re Pine Lake Village Apartment Co.,* 19 B.R. 819, 828–31 (Bankr.S.D.N.Y.1982).

The debtor's final argument that "the separation of the Class 3 creditors from the FDIC's unsecured claim is permitted by Section 1122(b)" (e.g. "for administrative convenience"), *Debtor's Reply Brief* at 24, is too attenuated to require any discussion.

The FDIC's unsecured deficiency claims approximates $500,000 and that of the unsecured trade creditors who voted to accept the plan approximates only $5,000. To paraphrase the *Greystone III* court, 948 F.2d at 141, the debtor's classification scheme effectively disenfranchised the FDIC's deficiency claim, a result sanctioned neither by the Code nor by case law.

## IV.

### CONCLUSION

There being no validly-classified, noninsider, impaired class that has accepted the debtor's Plan, the objection of the FDIC is sustained, and confirmation of the Plan is denied. This ruling makes it unnecessary to discuss the FDIC's further objections concerning the propriety of utilizing negative amortization in the treatment of the FDIC's secured claim, and the existence *vel non* of the "new value" exception to the absolute priority rule. It is

SO ORDERED.