**In the Matter of FI–HI PIZZA, INC., Debtor.**

**Bankruptcy No. 82–02209–HL.**

United States Bankruptcy Court, D. Massachusetts.

May 17, 1984.

Frank D. Kirby, Boston, Mass., for debtor.

Jeffrey S. Ogilvie, Tax Counsel, Dept. of Revenue, Legal Bureau, Boston, Mass., for Com. of Mass.

## MEMORANDUM ON INTEREST RATES PURSUANT TO 11 U.S.C. SECTION 1129(a)(9)(C)

HAROLD LAVIEN, Bankruptcy Judge.

The issue before the Court is the determination of the interest rate to which the Commonwealth taxing authority is entitled, pursuant to 11 U.S.C. § 1129(a)(9)(C). Specifically, Fi-Hi Pizza, Inc. (the "debtor") filed a plan of reorganization and disclosure statement on November 4, 1983. Debtor's plan of reorganization merely provided that priority tax claims "shall be paid in full in deferred cash payments over a period of up to six years as provided in Section 1129(a)(9)." On January 12, 1984, the Commissioner of Revenue for the Commonwealth of Massachusetts objected to the debtor's disclosure statement and plan of reorganization as it did not require payment of interest at the rate of eighteen per cent (18%) per annum as required for delinquent tax payments under Mass.Gen.Laws ch. 62C, § 32, as amended by section 34 of Chapter 233 of the Acts of 1983.

As a result of the Commonwealth's objection, the debtor, after an initial hearing on the disclosure statement on January 16, 1984, amended the disclosure statement and plan of reorganization to provide for the interest rate established by the Internal Revenue Code, 26 U.S.C. § 6621, then, as now, eleven (11) per cent. The Commonwealth continued to object, insisting on 18%. The Court heard arguments on the subject of interest rate by the debtor and the Commonwealth and each party briefed the issue. At the confirmation hearing, held on May 8, 1984, additional evidence was presented and each party made additional arguments. Although the Court confirmed the plan,[1] it took this issue under

---

1. The Court notes that 11 U.S.C. § 1129 provides for confirmation only if the interests of taxing authorities are appropriately treated. *See In re*

*Roxbury Residential Associates, Inc.,* 35 B.R. 348, 350 (Bkrtcy.D.Conn.1983). Although the Commonwealth's original objection was to con-

advisement. After reviewing the parties' briefs and the evidence presented at the confirmation hearing, and the Court's own thorough analysis of the relevant cases, the Court makes the following findings of facts and conclusions of law.

The present provisions for handling tax claims in Chapter 11, primarily 11 U.S.C. § 1129(a)(9)(C), have undergone major philosophical changes compared to the Bankruptcy Act of 1898, formerly title 11 (repealed 1979) (the "Act"). Under the Act, absent the assent of the taxing authority, no plan could be confirmed without payment in full. Bankruptcy Act §§ 337(2) & 64, formerly 11 U.S.C. §§ 737(2), 104. *See also*, Bankruptcy Act §§ 221 & 199, formerly 11 U.S.C. §§ 621 & 599 (Chapter X) and Bankruptcy Act § 455, formerly 11 U.S.C. § 855 (Chapter XII).[2]

In 1970, Congress began the long job of rewriting the bankruptcy laws. Public Law 91–354, effective July 24, 1970, created the Commission on Bankruptcy Laws. At least two of the earliest versions continued the Chapter XI treatment of priority taxes. *See* H.R. 31 & 32, 94th Congress, 2nd Session (1975), §§ 4–405(a)(5) and 7–303(2) and accompanying Commission Report at 244.[3] H.R. 31 represented the statutory proposal of the Commission, while H.R. 32 represented an alternative, drafted by the National Conference of Bankruptcy Judges.[4]

After much study, public hearings, and suggested changes, the bills were refined and formulated into a proposal that was introduced by Congressmen Edwards and M. Caldwel Butler in the House of Representatives as H.R. 6 on January 4, 1977. After further changes and suggested drafts, the bill was re-introduced on July 11, 1977 in the House as H.R. 8200. H.R. 8200 represented a major departure in the handling of tax claims. Specifically, proposed § 1129(a)(9) reads:

> (9) The plan provides that each holder of a claim of a kind specified in section 507[5] of this title will receive, on account of such claim, property, other than a

firmation, the Commonwealth, in the interests of not causing further hardship to the debtor and creditors, withdrew its objection to confirmation and instead submitted an amended proof of claim. The proof of claim provided for interest at the rate of 18%. Accordingly, procedurally, the Court's rulings relate solely to the Commonwealth's proof of claim, the Commonwealth having stated in open court that regardless of the outcome of this issue it had no objection to confirmation of the plan and any appeal it might consider would be limited to the proof of claim.

2. Specifically, Bankruptcy Act § 337(2) reads:
(2) fix a time within which the debtor shall deposit, in such place as shall be designated by and subject to the order of the court, the consideration, if any, to be distributed to the creditors, the money necessary to pay all debts which have priority, unless such priority creditors shall have waived their claims or such deposit or consented in writing to any provision of the arrangement for otherwise dealing with such claim, and the money necessary to pay the costs and expenses of the proceedings ...
§ 64(a) reads:
The debts to have priority, in advance of the payment of dividends to creditors, and to be paid in full out of bankrupt estates, and the order of payment shall be ...
(4) taxes which become legally due and owing by the bankrupt to the United States or to any State or any subdivisions thereof which are not released by a discharge in bankruptcy:

3. The relevant sections are identical in H.R. 31 and 32. § 4–405(a)(5), dealing with priorities, reads:
(5) fifth, among allowed tax claims of the United States, any State, and any subdivision thereof, to the extent the claim is for—
(A) taxes upon or measured by income...
(B) ad valorem taxes ...
(C) taxes withheld from wages;
(D) employment taxes on wages paid by the debtor prior to the petition ...
(E) customs duties and excise taxes ...
While § 7–303(2) provides that
A plan of reorganization ... shall provide for the payment or securing of the claims specified in § 4–405(a)(1)–(5), subject to the limits therein prescribed;
the accompanying Commission report notes that
(t)hus Chapter VII essentially utilizes the present Chapter XI approach to priorities. *See* § 337(2) of the present Act.
Commission Report, at 244, dated Sept. 2, 1975.

4. In the Senate, Senator Burdick reintroduced the House Commission's proposals as S.236 and 235, respectively.

5. § 507, of course, refers to priority tax claims.

security of the debtor, an affiliate participating in a joint plan with the debtor, or a successor to the debtor under the plan, of a value, as of the effective date of the plan, equal to the allowed amount of such claim, except to the extent that the holder of a particular claim of such kind has agreed to a different settlement of such claim.

Although the language is less than clear, the legislative history manifests that

"Value, as of the effective date of the plan," as used in paragraph (3) and in proposed 11 U.S.C. 1179(a)(7)(B), 1129(a)(9), 1129(b), 1172(2), 1325(a)(4), 1325(a)(5)(B), and 1328(b), indicates that the promised payment under the plan must be discounted to present value as of the effective date of the plan. The discounting should be based only on the unpaid balance of the amount due under the plan, until that amount, including interest, is paid in full.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 408 (1977) U.S.Code Cong. & Admin.News 1978, pp. 5787, 6364. Accordingly, under the proposed House version, debtors had the opportunity to spread payments to taxing authorities, although equal to "present value," over as long a period as the debtor saw fit.

The Senate, of course, had their own version of § 1129(a)(9). Their proposal, encompassed in S.2266 as introduced by Senator DeConcini on October 31, 1977, required:

payment of a tax liability due the United States must be made in cash not later than 120[6] days after confirmation of the plan, unless the Secretary of the Treasury or his delegate agrees to other terms or kinds of payment.

Proposed § 1130(a)(10)(B). As the Senate report noted:

"A three-way tension thus exists among (1) general creditors, who should not have the funds available for payment of debts exhausted by an excessive accumulation of taxes for past years; (2) the debtor, whose 'fresh start' should likewise not be burdened with such an accumulation; and (3) the tax collector, who should not lose taxes which he has not had a reasonable time to collect ..."

S.Rep. No. 989, 95th Cong., 2nd Sess. 14 (1978) U.S.Code Cong. & Admin.News 1978, pp. 5787, 5800.

Eventually, each house compromised on the issue in question, as well as others, in an amended H.R.8200. As reported on both the floors of the House and Senate:

Section 1129(a)(9) represents a compromise between a similar provision contained in the House bill and the Senate amendment.

. . . .

Tax claims entitled to priority under section 507(a)(6) of different governmental units may not be contained in one class although all claims of one such unit may be combined and such unit may be required to take deferred cash payments over a period not to exceed 6 years after the date of assessment of the tax with the present value equal to the amount of the claim.

124 Cong.Rec. H32406 (daily ed. September 28, 1978) (statement of Rep. Edwards); 124 Cong.Rec. S34,006 (daily ed. October 5, 1978) (statement of Sen. Deconcini).[7] The final version of 11 U.S.C. § 1129(a)(9)(C) reads:

with respect to a claim of a kind specified in section 507(a)(6) of this title, the holder of such claim will receive on account of such claim deferred cash payments, over a period not exceeding six years after the date of assessment of

---

6. The original bill, as introduced, made provision for payment within 60 days, not 120 days. See S.Rep. No. 989, 95th Cong., 2nd Sess. 128 (1978). This change was made by the Senate Finance Committee. See S. 2266 at p. 1 & 538 as reported in the Senate by Mr. Deconcini on July 14, 1978.

7. For a more complete history of the legislative storms involved in passage, see, Klee, Legislative History of the New Bankruptcy Law, 28 De Paul L.Rev. 941 (1979).

such claim, of a value, as of the effective date of the plan, equal to the allowed amount of such claim.

In sum, the two houses of Congress agreed to allowing debtors six years from the date of assessment, to pay off all priority taxes owed, a drastic change from the Act and early drafts of the Code.

Although the specific manner in which the Court is to carry out the legislative mandate is anything but clear, the language of § 1129(a)(9)(C) and the accompanying legislative history make the general intention clear—namely, that the sum of the deferred payments made to the tax authorities must have a present value at the effective date of the plan [8] that would *approximately* equal the allowed claim. I say "approximately" because Congress, when it sought exact equivalency, utilized such graphic terms as "indubitable equivalent." 11 U.S.C. § 361(3); *but see, In re Cooper,* 11 B.R. 391, 394 (Bkrtcy.N.D.Ga. 1981). In any case, the critical term to be analyzed is the elusive phrase "present val-

ue," also known as present discounted value.[9]

Present value is not necessarily a legal concept, but rather a term of art used by the economic and financial communities. *In re Fisher,* 29 B.R. 542, 543 (Bkrtcy.D. Kansas 1983). One author has defined it as:

> the value today of a future payment or stream of payments, discounted at the appropriate discount rate.

Brigham, Financial Management Theory and Practice 916 (1st Ed.1977); *see also,* Samuelson, Economics 596, 613–14 (9th Ed. 1973); *In re Fisher,* 29 B.R. 542, 543. Put another way, present value reflects the financial reality that a dollar that is received in the future, is not worth the same as a dollar in hand today. Not only does inflation deflate the value of what a dollar may purchase in the future, but a party that has a dollar today may invest it in a variety of investments that would yield a return. In defining the present value in a mathematical context, the following formulas have been devised:

For a single payment: $$PV = \frac{DP}{(1+i)^t}$$

For a series of payments: $$PV = \frac{1st\ DP^1}{(1+i)^1} + \frac{2nd\ DP^2}{(1+i)^2} + \ldots + \frac{nth\ DP^n}{(1+i)^n}$$

with $PV$ = to present value
$DP$ = to deferred payment
$i$ = interest rate or discount rate
$t$ = time period
$n$ = total number of payments

---

*See* Managerial Finance, Weston & Brigham 229 (5th Ed.1975); Micro-economic Theory, Henderson & Quandt 297 (2nd Ed. 1971); Lavien, West, Bankruptcy Forms; 173 n. 11 & 12 (Supplement 1983).

All of this makes the problem seem subject to a neat and exact mathematical solution, except that the formula requires the insertion of a discount rate in order to

insure that the deferred payments, adjusted to present value, are indeed equal in value to a current cash payment of the tax claim.[10] This unknown rate is not conveniently found in a table but, like so many aspects of law, requires a judgment call. This rate should not be static if it is truly going to reflect market conditions. In the case at bar, like most plans before the

---

**8.** The term effective date of a plan of reorganization itself raises issues; however, for present purposes a practical resolution, and one in keeping with past history will be considered as the date of confirmation.

**9.** *See* Samuelson, Economics 613 (9th Ed.1973).

**10.** In the case at bar, the debtor's original plan, like most before the Court, does not provide a fixed payment; but rather that deferred payments are to include "interest."

Court, the debtor seeks to apply the smallest acceptable rate [11], in this case 26 U.S.C. § 6621 (presently 11%), which may or may not actually reflect the true discount rate at a given period of time. The Commonwealth, as noted previously, seeks to apply 18%. Mass.Gen.Laws Ch. 62C § 32. Accordingly, it is the Court's responsibility to review and fix the appropriate discount/interest rate in question.

The discount rate is that factor which equalizes future payments with the tax claims. Put another way, it is that rate, when utilized to determine deferred payments, places a party in "as good a position" as if it had received its claim now, rather than later. *In re Southern States Motor Inns, Inc.*, 709 F.2d 647, 652 (11th Cir.1983). *See also, In re Burgess Wholesale Mfg. Opticians, Inc.*, 721 F.2d 1146, 1147 (7th Cir.1983) ("proposed payments must be adjusted to allow for the changing value of the dollar.") A party could argue that a taxing authority is entitled to only the rate of inflation. Such a rate would insure that the state could purchase the same items in the future that it could purchase presently if it had the funds at hand. This argument [12], however, is without merit. If the taxing authorities had received the funds now, it could invest them in a variety of securities that would insure a rate of return that is greater than the inflation rate. Certainly, if it had to borrow money to make up for the deferred payments, it would pay a higher rate of interest than the rate of inflation. Indeed, the rate of return received by lenders on relatively risk-free investments have been historically 3% over the inflation rate. Weston and Brigham, Managerial Finance 736

(5th. Ed.1975). Accordingly, any interest rate based merely upon the inflation rate is inappropriate.

A previously quoted set of authors has defined the discount rate:

as the required rate of return, and it is the minimum rate of return necessary to induce investors to buy or hold a *security*.

(emphasis added) Weston & Brigham, Managerial Finance 539 (5th Ed.1975).

In the case at hand, the "security" in question is, in the truest sense of the word, a forced loan to the confirmed debtor. Accordingly, the rate of interest must reflect the viability of the chapter 11 debtor. Although the federal, state, and local governments borrow money at a relatively low rate of interest, the risk of a government not paying and the risk of the debtor not paying, are two quite different risks. If the debtor's plan of reorganization succeeds, the Commonwealth will receive the full balance of money it is owed, plus, averaged over the cases, sufficient interest to compensate for the use of the Commonwealth's funds. But if the plan fails, the taxing authority will receive, in all likelihood, something substantially less than the tax claim. In essence, the taxing authorities are funding chapter 11 debtors with involuntary loans of public funds, although when it finally receives payment over the six-year maximum period it should receive a total amount that would be approximately equal to the value of the payment had it been made in full on the effective date of the plan.

Be it a forced plan or not, the Commonwealth, by receiving payment later rather

**11.** This problem is not restricted to taxes under chapter 11 but is found throughout the Bankruptcy Code whenever periodic payments are to be employed in a plan. *See* §§ 1129(b), 1325(a)(4), 1325(a)(5)(B)(ii) & 1328(b)(2); but note the language ("indubitable equivalent") when the concept becomes adequate protection, §§ 361, 362, 363 and 364, more closely related to constitutionally protected due process. *See* James and Kirland, *Adequate Protection Through Augmented Interests in Reorganization Plans*, 58 Am.Bankr.L.J. 69 (1984); Blum, *Treatment of Interest on Debtor Obligations in Reor-*

*ganizations Under the Bankruptcy Code*, 50 U. of Chi.L.Rev. 430 (1983); Rogers, *The Impairment of Secured Creditors' Rights in Reorganization: A Study of the Relationship Between the Fifth Amendment and the Bankruptcy Clause*, 96 Harv.L.Rev. 973 (1983).

**12.** The Court notes that neither party has argued this view. The Court discusses it, *sua sponte*, only to illustrate an extreme point of view and the difficulty in arriving at an appropriate rate of interest.

than now, is "risking" its money in the debtor. *See, In re Fisher*, 29 B.R. 542, 544 (Bkrtcy.D.Kansas 1983) (a "coerced loan"). Accordingly, the Court must determine at what rate of interest a routine investor would be willing to so risk his money.[13] Such a rate is commonly referred to as the "market rate"—the rate that lenders would be willing to lend the debtor under similar conditions, including the time period, the secured or unsecured status, the interest rates being paid in the market on comparable as well as "riskless" loans, the financial viability of the debtor, to name only a few factors. *See, In re Southern States Motor Inns, Inc.*, 709 F.2d 647, 652 (11th Cir. 1983). Of course, the use of the term "market rate" may narrow but does not end this Court's analysis. The Court must still determine the appropriate "market rate."

Despite the careful use of language in most instances, "the drafters of the Bankruptcy Code did not include a lengthy or specific explanation of the use (of) a discount rate ... for deferred payment of unsecured priority tax claims as contemplated by § 1129(a)(9)(C)." *In re Bay Area Services*, 26 B.R. 811, 813 (Bkrtcy.M.D.Fla. 1982). Accordingly, "(f)ew other issues under the bankruptcy code have produced so many opinions with such varied results as has the issue of appropriate interest rate for determining present value." *In re Jones*, 32 B.R. 951, 958, n. 12 (Bkrtcy.D. Utah 1983). Accordingly, to determine whether any of the approaches already considered by other courts are to be adopted, an analysis of the pertinent cases is in order.

The first circuit to rule on the issue of an appropriate interest rate was the 11th Circuit in *In re Southern States Motor Inns, Inc.*, 709 F.2d 647 (11th Cir.1983). In that case the debtor's plan of reorganization

only proposed to pay 6% on unpaid federal tax liabilities of $412,144.93. The United States ("appellant") objected, and a hearing was held to determine the appropriate rate. At the hearing, the debtor presented evidence that interest rates on mortgages recently obtained on the sale of its motel properties ranged from 9.1 to 10%.[14] Appellant presented evidence that safe investments yielded 14%, with riskier investments appropriately higher. Appellant, however, noted that it would accept 12%, apparently the § 6621 rate. The Bankruptcy Court utilized the § 6621 rate less 1% attributed to "rehabilitation aspects." The Circuit Court held:

> The factors relevant to determining an appropriate interest rate are succinctly summarized in 5 Collier on Bankruptcy ¶ 1129.03, at 1129–65 (15th ed. 1982):
>
> > The appropriate discount (interest) rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount (interest) rate, the court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration of the quality of the security and the risk of subsequent default.
>
> The interest rate computed under the formula set out in 26 U.S.C. § 6621 does not meet this criteria for two reasons. First, the § 6621 rate does not necessarily correspond with the "prevailing market rate." At the time of the confirmation hearing, when the bankruptcy judge ruled that he would henceforth use the § 6621 rate less 1%, the § 6621 interest rate could lag almost two years behind actual market rates. Even with the recent amendments to § 6621, the § 6621 rate in effect on the date of a confirma-

---

**13.** Interest rates, no matter how they are analyzed, are determined by the factors of supply and demand. *See* Henderson & Quandt, Microeconomic Theory 319–320 (2d Ed.1971); Samuelson, Economics 599–604 (9th Ed.1973); Weston & Brigham, Managerial Finance 242 (5th Ed.1975). Money is actually a commodity that can be offered for use at a price. Accord-

ingly, interest rates have also been referred to as the rental value of money.

**14.** The Circuit Court noted that the circumstances of these transactions did not make the interest rates reflective of prevailing market rates. 704 F.2d at 653 n. 10.

tion hearing will have been established from three and one-half to nine and one-half months previously. In view of recent fluctuations in interest rates, it is obvious that the § 6621 rate often will differ significantly from actual market rates.

. . . .

Second, applying the § 6621 rate to all deferred payments under § 1129(a)(9)(C) ignores variations between the length of the payout period, the quality of the security, and the risk of subsequent default. Thus, although the rate currently charged under § 6621 may be relevant to determining the prevailing market rate, we believe the Bankruptcy Court erred by looking exclusively to the § 6621 rate when establishing the interest rate in this case.

In addition, we believe the district court erred when it deducted 1% from the interest rate to be applied to the deferred payments for the "rehabilitation aspects" of the reorganization plan. As noted in *In re Benford, supra,* a Chapter 13 case construing language identical to that found in § 1129(a)(9)(C) "(t)he statute reads 'value, as of the effective date of the plan'; it does not read 'value, as of the effective date of the plan, but subject to reduction depending on the debtor's ability to pay'." 14 B.R. at 161. We believe Congress intended that creditors required to accept deferred payments pursuant to § 1129(a)(9)(C) should be placed in as good a position as they would have been had the present value of their claims been paid immediately. Consequently, we hold that the interest rate to be used in computing present value of a claim pursuant to § 1129(a)(9)(C) should be the current market rate without any reduction for the "rehabilitation aspects" of the plan. (emphasis added and footnotes omitted) *Id.* at 651–653.

In essence, the *Southern State* Court was adopting the "market rate" as the appropriate interest rate. Although it criticized the § 6621 rate to some degree, it still noted its relevance if adjusted to compensate for the "variations between the length of payout period(s), the quality of the security, and the risk of subsequent default." However, in the end the Circuit Court adopted the 12% agreed upon rate and failed to make a thorough analysis of the specific nature of the "market rate." Accordingly, it left for other courts the responsibility to fashion a practical method to determine the market rate that will, if possible, provide the bar, debtors, and potential financiers of Chapter 11 plans with a readily ascertainable standard.

The only other circuit to rule on this issue is the Seventh Circuit in *In re Burgess Wholesale Mfg. Opticians, Inc.,* 721 F.2d 1146 (1983), *reversing* 24 B.R. 554 (D.C.N.D.Ill.1982) and 16 B.R. 733 (Bkrtcy. N.D.Ill.1981), the only two reported cases denying interest to taxing authorities. Here the debtor proposed to pay a federal tax claim in equal monthly installments, but with no interest. The United States, appropriately, objected.

The Circuit Court, after reviewing the legislative history, held that "the government's position in this case is in line with the overwhelming weight of authority." *Id.* at 1147. However, the Court noted that

Having determined that the bankruptcy court erroneously overruled the government's objection to the plan, we decline to proceed further to discuss the appropriate discount or interest rate applicable in this case. In the absence of guidance from the bankruptcy and district courts, we find it inappropriate for a Court of Appeals to decide this question.

*Id.* Accordingly, the Circuit Court remanded the case to the Bankruptcy Court for further proceedings. Again, such a result forces the trial courts to devise a workable standard. Although both circuits added to the general discussion and hypothetical needs, both avoided proposing specific standards.

Among the Bankruptcy Courts to decide this issue, Judge Shiff in *In re Connecticut Aerosols, Inc.,* 31 B.R. 883 (Bkrtcy.D.

Conn.1983) rejected the § 6621 rate, primarily citing the *Southern States* Court. Instead, the Bankruptcy Court focused upon the rate promulgated in 28 U.S.C. § 1961(a), the section that governs interest on federal judgments. That provision provides for interest based upon "the average accepted price of the last auction of fifty-two week U.S. treasury bills settled immediately prior to the date of judgment." The Bankruptcy Court found that this rate "more closely tied to current economic conditions at the time of confirmation of a Chapter 11 Plan of Reorganization." *Id.* at 886, citing *In re Tacoma Recycling, Inc.,* 23 B.R. 547, 550 (Bkrtcy.N.D.Wash.1982). Judge Shiff concluded that:

> Given the two alternatives presented by the parties here and the lack of any evidence suggesting that a different rate might be appropriate under the circumstances of this case, I find that the rate established by 28 U.S.C. § 1961(a) will best provide the Government with the full amount of its allowed claim.

*Id.* at 886.

This Court cannot fully agree that the judgment rate is the best approach. First it makes no adjustment to compensate for the differences in creditworthiness between the debtor and treasury bills issued by the United States Government. Second it is based upon a single sale date of treasury bills. Thirdly, although the § 6621 rate is criticized for its time lag over the years of periodic payments, it is still reflective of general market conditions. Indeed, the *Southern States* Court noted that "§ 6621 may be relevant to determining the prevailing market rate." 709 F.2d at 652. Fourthly, the § 1961(a) rate is subject to daily, if not hourly and minute changes. Such changes are not necessarily reflective of general market conditions but may reflect technical changes on that particular day.[15]

Judge Shiff also ruled on the question of interest rates in *In re Roxbury Residential Associates, Inc.,* 35 B.R. 348 (Bkrtcy. D.Conn.1983) as they might be controlled by state statute. There the debtor assigned an 8% rate of interest to the town of Roxbury tax claim. Apparently, Connecticut state law also provided for an 18% rate. The Court noted:

> In sharp contrast to the interest rate provided by 28 U.S.C. § 1961 and even 26 U.S.C. § 6621, which provide for adjustments to approximate current market conditions, the rate established by § 12–146, Conn.Gen.Stat. is fixed and has no apparent relationship to current market conditions. Section 12–146 is therefore ill suited to meet the objectives of Code section 1129(a)(9)(C), and the Town's objection in that regard must be and hereby is overruled.

> . . . .

> It is, however, neither appropriate nor prudent for this Court to cure defective elements in a debtor's plan. Accordingly, the debtor's invitation to actively participate in drafting its plan is declined and the debtor is instructed to file an amended plan consistent with this order.

*Id.* at 350.

Other cases have rejected the § 6621 rate. In *In re Bay Area Services,* 26 B.R. 811 (Bkrtcy.M.D.Fla.1982), the Court did not agree that the § 6621 rate was

> the correct discount rate merely because the IRS applies (the § 6621 rate) across the board interest rate to delinquent federal tax claims. Whereas the (§ 6621) rate may be particularly appropriate when assessed against delinquent federal tax claims, it looms static and arbitrary when applied to the deferred payment of an unsecured priority tax claim where the primary intent is provide the Government with a future amount equal in value to an amount paid in full upon the

---

**15.** i.e., the size of the auction. *See also* "Kaufman, Rate Remarks Raise Havoc in Market," Boston Globe, May 5, 1984, p. 21. The Court notes that the only rate that did not change because of Mr. Kaufman's remarks was the prime rate, the basis of the § 6621 rate. The Court also notes that the 3-month treasury bill rate dropped .3% the day before this opinion was issued, indicative of the unreliability of any specific treasury bill rate.

effective date of the Chapter 11 Plan of Reorganization.

*Id.* at 814. Instead, the Court applied "the current prevailing prime rate plus 10% adjustment for inflation," which in the Court's opinion, was the "industry practice for determining present value of (a) claim." *Id.* at 814. The *Bay Area* Court, however, did not cite any support for this practice. Moreover, this Court is unaware of any such industry practice. While this Court does not deny that the § 6621 rate was intended for something other than a present value analysis, this Court believes it does reflect general market conditions and, when adjusted with an additional factor, may provide an appropriate rate of interest. *See also, In re Moore,* 25 B.R. 131, 134 (Bkrtcy.N.D.Tex.1982) (application of § 6621 could result in a "windfall" to the IRS) and *In re Tacoma Recycling, Inc.,* 23 B.R. 547, 549–50 (Bkrtcy.W.D.Wash. 1982) (the § 6621 rate is not as current as the 28 U.S.C. § 1961(a) judgment rate). These cases all seem to overlook the averaging involved in Sec. 6621 and assume that the Sec. 6621 rate in effect on the effective date would continue to apply no matter how long the periodic payment despite changes during the period in the money market and the Sec. 6621 rate.

The § 6621 rate, however, is not without its supporters in Chapter 11 cases. In *In re Hathaway Coffee House, Inc.,* 24 B.R. 534 (Bkrtcy.S.D.Ohio 1982), after a brief discussion, the Bankruptcy Court held that the § 6621 rate was the appropriate rate. *Id.* at 536. Moreover, in *In re Nite Lite Inns,* 17 B.R. 367 (Bkrtcy.S.D.Cal.1982) the Bankruptcy Court held that in the context of a "cramdown," the § 6621 rate offered protection to a secured party. For other approaches *see, In re Sullivan,* 26 B.R. 677 (Bkrtcy.W.D.N.Y.1982) (9.5% is insufficient for a secured party in a cramdown) and *In re Landmark at Plaza Park, Ltd.,* 7 B.R. 653 (Bkrtcy.D.N.J.1980) (12.5% provided to a secure party in a cramdown is too low, 15% may have been sufficient).

In the context of Chapter 13, there are at least fifty cases, by one Court's estimate.[16] *In re Jones,* 32 B.R. 951, 958 n. 12 (Bkrtcy. D.Utah 1983). Although the relevance of these cases is open to question,[17] some discussion is warranted.

*In re Fisher,* 29 B.R. 542 (Bkrtcy.D.Kansas 1983) is perhaps the most extensive. In short, the *Fisher* Court dealt with the issue of interest due the IRS pursuant to 11 U.S.C. § 1325(a)(5)(B)(ii). The Bankruptcy Court, in a lengthy opinion, tracked the basis of present value, discussed the nature of interest that must be paid, and noted many of the other decisions in the context of Chapter 13. In sum, it rejected the § 6621 rate in favor of the 52-week treasury bill rate, plus a 1% additional risk factor. In respect to the 1% adjustment, the 1% seems too low but the approach would seem to merit consideration. Although commercial lenders incur costs and profits that are not relevant in the case at bar, the risk inherent in debtors [18] necessitates an adjustment greater than one per cent. Of particular note is the *Fisher* Court's comment that, although confirmed chapter 13's are determined to be "feasible," one-third fail. Few commercial lenders would survive with such a failure rate without sufficient protection. Although this Court finds the *Fisher* Court's analysis admirable in many respects, I do not so much disagree with it and its conclusions but rather determine that it is not the one this Court prefers.

Other chapter 13 cases have utilized the § 6621 rate, *see, e.g., In re Stafford,* 24 B.R. 840 (Bkrtcy.D.Kansas 1982); *In re Caudle,* 13 B.R. 29 (Bkrtcy.W.D.Tenn.

**16.** Most of these cases can be found in *In re Fisher,* 29 B.R. 542 (Bkrtcy.D.Kansas 1983) and *In re Evans,* 20 B.R. 175 (Bkrtcy.E.D.Pa.1982).

**17.** "Many factors may make the complexion of the risk in a chapter 13 case different from the risk in chapter 11." *In re Jones,* 32 B.R. at 958, n. 12.

**18.** The Court, of course, means "debtors" who have filed for protection of the Bankruptcy Code. In the most general sense, all entities that borrow money are "debtors."

1981); *In re Strong,* 12 B.R. 221 (Bkrtcy. W.D.Tenn.1981); *In re Van Nort,* 9 B.R. 218 (Bkrtcy.E.D.Mich.1981); *In re Johnson,* 8 B.R. 503 (Bkrtcy.S.D.Tex.1981); *In re Ziegler,* 6 B.R. 3 (Bkrtcy.S.D.Ohio 1980); *In re Busman,* 5 B.R. 332, 341 (Bkrtcy.E. D.N.Y.1980); others have adopted the contract rate in the original security agreement,[19] *see, e.g., In re McMichen,* 23 B.R. 497 (Bkrtcy.N.D.Ga.1982); *In re Evans,* 20 B.R. 175 (Bkrtcy.E.D.Pa.1982); *In re Kauffunger,* 16 B.R. 666, 669 (Bkrtcy.D.N.J. 1981); *In re Clements,* 11 B.R. 38 (Bkrtcy. N.D.Ga.1981); *In re Rogers,* 6 B.R. 472 (Bkrtcy.S.D.Iowa 1980); others have used the federal judgment rate of 28 U.S.C. § 1961(a), *see, e.g., In re Jewell,* 25 B.R. 44 (Bkrtcy.D.Kansas 1982); *In re Marx,* 11 B.R. 819 (Bkrtcy.S.D.Ohio 1981); *In re Williams,* 3 B.R. 728 (Bkrtcy.N.D.Ill.1980); *In re Crockett,* 3 B.R. 365 (Bkrtcy.N.D.Ill. 1980); and others have utilized a variety of other solutions, *see, e.g., In re Willis,* 6 B.R. 555 (Bkrtcy.N.D.Ill.1980) (three-month treasury bill rate plus ½%); *In re Kibler,* 8 B.R. 957 (Bkrtcy.D.Hawaii 1981) (a rate between the sales contract and the rate charged by credit unions); *In re Benford,* 14 B.R. 157 (Bkrtcy.W.D.Kentucky 1981) (the market rate for consumer loans); *In re Klein,* 10 B.R. 657 (Bkrtcy.E.D.N.Y.1981) (a rate between the contract rate and the state legal rate); *In re Weaver,* 5 B.R. 522 (Bkrtcy.N.D.Ga.1980); *In re Hyden,* 10 B.R. 21 (Bkrtcy.S.D.Ohio 1980).

Like so many matters that face the Court, there is no one correct answer. All of the above opinions on the subject are well reasoned and provide justifiable answers. I suggest all might well be correct. Much like assessing damages in a tort case or eminent domain case, there is no one absolute answer and any determination that does not offend the conscience of the appellate court probably would be upheld.

I would even respectfully suggest that, at the appellate level, this might be one of those cases that would justify the comment that "we affirm the reasonable exercise of the trial court's judgment, although if we were to decide the matter in the first instance, we might reach a slightly different result." In any case, in light of the disparity of the decided cases, this Court's own analysis follows.

The market rate for an individual security or loan has been described as being composed of two elements, a "riskless" rate and an element that compensates a party for the risk he may be taking. *See In re Fisher,* 29 B.R. 542, 543 (Bkrtcy.D. Kansas 1983). Perhaps it is better said that although there are "riskless" investments, a party may invest in a higher yielding instrument if he/she is willing to take a risk. *See generally,* Weston & Brigham, Managerial Finance 242–43 (5th Ed.1975). In any case, United States treasury bills are universally considered a riskless security, not subject to default. *In re Willis,* 6 B.R. 555, 6 B.C.D. 1101, 1104 (Bkrtcy.N.D. Ill.1982). Three-month treasury bills presently yield a rate of 9.77% per annum, with other rates ranging to 12.99% for treasury bonds maturing in six years.

A review of other rates that encompass a greater risk accordingly display greater yields. For example, in the Boston metropolitan area, one-year variable mortgages yield 9.75 to 16.75%, five-year variable mortgages yield 12.75 to 14.75% and fixed mortgages yield 13.25 to 14.75%.[20] Automobile loans range from 11.75 to 15.25%, and personal loans from 16 to 18.8%. Of course, these are not business loans, nor can they be characterized, except for the last category, as unsecured. However, they included such factors as profits and costs, factors to which the taxing authori-

---

**19.** It should be noted that some courts have held that there is a legislative presumption that the contract rate should be utilized when a secured party is involved. *In re Rogers,* 6 B.R. 472, 475 (Bkrtcy.S.D.Iowa 1980); *In re Klein,* 10 B.R. 657, 661 (Bkrtcy.E.D.N.Y.1981).

**20.** None of these mortgage rates include the additional one to two "points" that are charged upon closing. Each "point" represents a one time charge of 1% of the total amount that is financed.

ties are not entitled.[21] *In re Fisher*, 29 B.R. 542, 545. Perhaps of greater comparability is the S.B.A. rate on direct loans to businesses, presently 12¾%. By definition, these loans are made to businesses which are unable to receive commercial financing. Accordingly, the rate reflects both the distressed nature of the business and, as the S.B.A. is a public agency, the lack of profit and costs that only commercial lenders incur. Of course, the S.B.A. is an agency that is continually in the "red" and, therefore, is in effect subsidizing those to which it lends money. Taxing authorities generally do not have the same obligation to subsidize delinquent taxpayers.

Also of note is the prime rate, presently 12.5%. The prime rate has been described as that rate that banks charge their best corporate customers. The Court notes that the prime rate has been criticized of late; that is, banks sometimes actually charge their best corporate customers at a rate that is less than prime. *See generally, Kleiner v. First National Bank of Atlanta*, 526 F.Supp. 1019 (N.D.Ga.1981).[21a] *See also*, The Wall Street Journal, April 3, 1984, p. 35, "Challenges to Prime Rate as Base for Loans Stir Fears Among Banks." Still, the Court views such controversy as

the exception rather than the rule and reserved for those most successful of companies, such as IBM, AT & T, and Exxon. In any case, it is doubtful that this debtor, indeed any chapter 11 debtor, could command the prime rate at any commercial bank. *See, In re Cooper*, 7 B.R. 537, 542 (Bkrtcy.N.D.Ga.1980). Accordingly, it would appear that the debtor's market rate would be at some level above the prime rate or above some comparable rate.

One comparable rate, as discussed earlier, is the I.R.S. rate on delinquent taxes.[22] 26 U.S.C. § 6621. It is based upon the prime rate, and adjusted semi-annually. As it is determined by the Department of Treasury, it is both accessible [23] and, being officially proclaimed, is definitive. Since it is based upon the prime rate, it approximates a current rate. *See, In re Nite Lite Inns*, 17 B.R. 367, 373 (Bkrtcy.S.D.Cal. 1982); *In re Ziegler*, 6 B.R. 3 (Bkrtcy.S.D. Ohio 1980). The Court notes that because the § 6621 rate is only adjusted semi-annually, it may not reflect the specific market rate at every given moment. However, as a starting point, the § 6621 rate has the advantage of not only practical availability, certainty, and the support of the nation's

---

**21.** The Court notes that this last statement of including profits and costs in the determination of the market rate may appear contradictory to the statement that the market rate is determined by supply and demand. *See* note 13 *supra*. Obviously any particular lender, as opposed to the market in general, has to temper the raw items of supply and demand with its individual costs if it is to stay in business.

**21a.** *See also*, The Wall Street Journal, "Bank's Use of Prime to Figure Loan Rates Is Voided in U.S. Court," May 16, 1984, p. 47.

**22.** Specifically, it reads:
(a) In general.—The annual rate established under this section shall be such adjusted rate as is established by the Secretary under subsection (b).
(b) Adjustment of interest rate.—
(1) Establishment of adjusted rate.—If the adjusted prime rate charged by banks (rounded to the nearest full percent)—
(A) during the 6-month period ending on September 30 of any calendar year, or
(B) during the 6-month period ending on March 31 of any calendar year,

differs from the interest rate in effect under this section on either such date, respectively, then the Secretary shall establish, within 15 days after the close of the applicable 6-month period, an adjusted rate of interest equal to such adjusted prime rate.
(2) Effective date of adjustment.—Any adjusted rate of interest established under paragraph (1) shall become effective—
(A) on January 1 of the succeeding year in the case of an adjustment attributable to paragraph (1)(A), and
(B) on July 1 of the same year in the case of an adjustment attributable to paragraph (1)(B).
(c) Definition of prime rate.—For purposes of subsection (b), the term "adjusted prime rate charged by banks" means the average predominant prime rate quoted by commercial banks to large businesses, as determined by the Board of Governors of the Federal Reserve System.

**23.** A telephone call to the local IRS office or this Bankruptcy Court's law clerk will establish the correct § 6621 rate.

largest tax collector, but also the flexibility of adjusting over the term of payment so that over the long run it will reflect the market rate and average out temporary aberrations.

The Commonwealth, in its brief, argues that "(t)he market rate of interest on delinquent tax claims is not set by the forces of supply nor by the usual process of negotiation between a hypothetical willing buyer and seller, or borrower and lender." In essence, the Commonwealth is arguing that interest owed on delinquent taxes is so unique that no comparable "market rate" can be determined. Even were the Court to agree,[24] that factor is irrelevant.

First, despite the Commonwealth's characterization, the requirement of 11 U.S.C. § 1129(a)(9)(C) establishes a structure that is analogous to repayment of a loan—that is, deferred payments that reflect both principal and interest, over a period of time. Further, courts are continually substituting hypothetical buyers and sellers to determine the respective rights of parties. The Court sees no reason for not doing the same here, especially when the Bankruptcy Code, at least in accordance with this Court's interpretation, demands a present value analysis and utilization of an appropriate market rate.

Second, the Commonwealth notes that it only requests a "fair" rate of interest and that it "concedes that a real question of reasonableness might be raised if the state legislature had established the rate ... at thirty or forty per cent." In effect, the Commonwealth argues that it did not confront the "Court with an arbitrary or unreasonable rate." Such a rationale, however, avoids the issues—an interest rate may be unreasonable if it is 40% or even if it is 18%. The basis behind such a rate and whether it is reflective of the market rate must be determined. However, the Commonwealth was unable to provide the Court with any legislative history. At most, it noted that "it is consistent with a historical pattern showing that the interest rate on delinquent taxes is generally twice the bond market yield on state and local bonds." Memorandum of the Massachusetts Department of Revenue, p. 17, n. 6. However, the Court notes that the interest rate in question is the result of a recent revision. Formerly, the Commonwealth utilized the rate contained in 26 U.S.C. § 6621. This was revised in an omnibus bill that was entitled "An Act to Provide a Revenue Enforcement and Protection Program for the Commonwealth". Acts of 1983, ch. 233 § 34. Accordingly, the Court can only infer that the purpose of imposing an 18% rate of interest was to punish and deter late payments.[25] This inference is buttressed by the Commonwealth's counsel who cited in his brief the language from *In re Fisher*, 29 B.R. 542 at 545:

> the (tax collector) has determined that its rate of interest must be high enough to deter tax evasion, restrict creative tax avoidance and compel timely payments.

While these are appropriate motives in setting an interest rate for delinquent taxpayers, they are not appropriate standards under § 1129 of the Bankruptcy Code which envisions a present value analysis—namely, providing the taxing authority with an interest rate that reflects the market rate/rental value of money,[26] economic con-

---

24. Much is made of the non-consensual nature of the tax deficiency. Of course, in the literal sense that is true—yet, is that completely true in a *realistic sense?* Usually the taxes in question are not income taxes but sales taxes or withholding taxes that should have been withheld by the debtor, subject to quarterly reporting. They did not, like Minerva, spring full grown from the head of Jupiter, but arose, in many cases, over a period of quarters, even years. They might be a surprise to the trade creditors, but not to the taxing authorities. The argument even might be made that there is an element of implied consent.

25. "Where the mind labors to discover the design of the legislature, it seizes everything from which aid can be derived ..." *United States v. Fisher*, 6 U.S. 358, 386, 2 L.Ed. 304 (1805); *see also, In re Caggiano*, 34 B.R. 449, 451 (Bkrtcy.D. Mass.1983); *In re Scher*, 12 B.R. 258, 260–61 (Bkrtcy.S.D.N.Y.1981); Frankfurter, *Some Reflections of the Readings of Statutes*, 47 Colum. L.Rev. 527 (1947).

26. *See* note 13 *supra*.

cepts that rule out such considerations as punishment, enforcement, and deterrence, among other considerations that do not relate to the discount rate and the determination of present value.

Finally, to argue that but for bankruptcy, the taxpayer would have paid interest at a particular rate because of a state statute is irrelevant. The taxpayer has filed for the protection of the federal Bankruptcy Code and state provisions have been preempted. *See* U.S. Const. art. VI, cl. 2 and art. I, § 8, cl. 2. This concept is the very heart of bankruptcy law whose raison d'etre is the very abrogation of non-bankruptcy obligations. The curing of default, *see In re Taddeo*, 9 B.R. 299 (Bkrtcy.E.D. N.Y.1981) *affirmed*, 685 F.2d 24 (2d Cir. 1982), and the avoidance of preferences, 11 U.S.C. § 547, are two classic examples. *See also*, 11 U.S.C. 525 (protection against governmental discriminatory treatment). Moreover, the Court notes that the Commonwealth recognizes that, as it must, bankruptcy considerations prevail over what otherwise would be normal state obligations and does not contend that it is entitled to interest during the pendency of the debtor's chapter 11 proceeding. 11 U.S.C. § 502(b)(2); *see also, In re Burgess Wholesale Mfg. Opticians, Inc.*, 721 F.2d 1146, 1147 n. 1 (7th Cir.1983).

The Court notes that there are those who would argue that imposition of a rate that is less than the rate requested by the Commonwealth is unfair, that it provides chapter 11 debtors with an unfair advantage, and that it deprives taxing authorities of needed revenues. However, such arguments are to be addressed to Congress, not the Courts—although as an aside, this Court is too often confronted with debtors that have accumulated large tax bills, both federal and state, casting their ominous shadow over the estate and unsuspecting trade creditors. *See generally*, LoPucki, *The Debtor in Full Control-System Failure under Chapter 11 of the Bankruptcy Code* (First Installment), 57 The American Bankruptcy Journal L.J. 99, (Second Installment) 57 The American Bankruptcy Journal L.J. 247 (1983). The Court cannot help wondering whether tax departments are their own worst enemies when they allow taxes to accumulate rather than nip the problem in the bud when the delinquencies are still of a manageable size.

Accordingly, the rate suggested by Mass.Gen.Laws ch. 62C § 32, that is 18% on delinquent tax claims, is irrelevant to this Court's determination of the appropriate market rate.

Debtor's counsel argues for court-adoption of 26 U.S.C. § 6621 without any further adjustment. In short, he argues that the "§ 6621 rate is calculated in a public and ascertainable manner, tied to general economic conditions." Debtor's Memorandum at p. 8. That the § 6621 rate is both public and ascertainable, cannot be doubted. However, although the § 6621 rate may be tied to general market conditions, it is not completely reflective of the market rate for chapter 11 debtors. As noted above, the § 6621 rate is based upon the prime rate, a rate few if any chapter 11 debtors could obtain. Accordingly, the § 6621 rate must be adjusted upward if it were to be utilized.

Debtor's counsel also argues that if the Court were to use a "pure" rate utilizing "hypothetical credit transactions pertaining to distressed small businesses ... in all probability the debtor could not obtain conventional unsecured financing at any price." The premise is doubted because the Court deals daily with requests to approve financing of chapter 11 debtors-in-possession. Further, if there is any hesitancy to loan chapter 11 debtors funds, the Court still must seek the market rate that is reasonable under all the circumstances. Certainly, the debtor's argument is a *non sequitor* when arguing for a lower rate because it is a bad risk. Although the Court cannot provide a "rehabilitative" discount, *In re Southern States Motor Inns, Inc.*, 709 F.2d 647 (11th Cir.1983); the Court can analyze a debtor absent the stigma of bankruptcy. Moreover, in order for the Court to confirm a plan, the Court must find a plan feasible. 11 U.S.C.

§ 1129(a)(11). Of course, confirmation does not mean that the debtor's plan is without risk. Simply put, some plans are more feasible than others. Still, confirmation of a plan does carry a significance in that the Court has judicially determined after a hearing that the plan is feasible and the debtor is not likely to need further bankruptcy relief. 11 U.S.C. § 1129(a)(11). Because § 1129(a)(9) does not come into play until after that determination, the state has the benefit of that weeding out process and in a sense, its collateral in this public financing of the chapter 11 debtor is the confirmed plan.

The Court notes that the § 6621 rate has been criticized in the past. *See, In re Southern States Motor Inns, Inc.,* 709 F.2d 647, 651–52 (11th Cir.1983); *In re Bay Services,* 26 B.R. 811 (Bkrtcy.M.D.Fla. 1982); *In re Moore,* 25 B.R. 131 (Bkrtcy.N. D.Tex.1982); *In re Tacoma Recycling, Inc.,* 23 B.R. 547, 556 (Bkrtcy.W.D.Wash. 1982). This criticism is based mainly upon a possible time lag of nearly two years in the effective date of interest changes. However, § 6621 was recently amended to provide for six-month adjustments, to bring the determination even closer to economic events and prevailing economic conditions. Pub.L. No. 97–248. Although it is still possible for a party to "reap a windfall," the fact that the rate imposed by the Court will change when the § 6621 rate changes during the course of the debtor's deferred payments, means that the inequities will balance themselves during the long run. Also, it should be noted that the prime rate of any particular date is minimized because the § 6621 rate is an averaging of six months of rate variances.[27]

As the Court has noted previously, the § 6621 rate approximates a current rate. Granted that there may be rates that are more reflective of the current market in the short-term, over the long-term—and that is what is involved in most periodic tax payments—the § 6621 rate, as periodically adjusted and averaged, does provide an approximation of an effective reflection of the market rate of interest and thus approaches present value. Moreover, determination of the § 6621 rate by the Department of Treasury provides an accessible public figure that is not open to dispute so that chapter 11 debtors and, most important, potential investors can have relative certainty in working toward reorganization. Accordingly, this Court will utilize though not confine itself to the § 6621 rate in determining the market rate.

The question remains as to what is the appropriate adjustment. The Court, in analyzing the previously described loan rates (home mortgage rates from 1.25% below § 6621 to 5.75% above, unsecured personal loans from 5 to 8% above), treasury notes and bonds (from 1.23% below and 1.99% above), and the SBA rate (1.75% above) as they relate to the present § 6621 rate, and having a special regard to its almost daily experience with the rates charged by actual commercial lenders and other financier's of chapter 11 debtors that range from one to three per cent over prime,[28] finds that a rate that is 2.5% above the § 6621 rate as periodically adjusted to be appropriate.[29]

---

**27.** The prime rate, after more than a year of relative stability, has only recently risen from 11% to 12½%. *See generally,* The New York Times, dated May 9, 1984, § A, p. 1 "Banks Lift Prime Rate to 12½%."

**28.** Although such loans are usually apparently granted, they are made at a time when confirmation is still uncertain and liquidation rather than going concern values would prevail.

**29.** The Court has also taken into account the general nature of the condition of the debtors before it and special nature of this coerced loan, including the length of time and the financial weakness of the debtor. The Court also is

aware of the distinction between the tax delinquency and the other claimants to present value in 11. U.S.C. § 1129. In that the tax claims did not originate in a consensual arrangement but rather in a breach of legal obligation and they have no real comparable market. The balancing consideration is that in many cases, because of the frequently wrongful nature of its origin, there is additional aid to ultimate collectability in transferee liability.

Of course, in *truly unique* circumstances, either generally or individually, the Court would be expected to re-evaluate this market rate equalization factor, by either lowering or increasing it. At the hearing, neither party

Such a combined rate will provide the Commonwealth taxing authorities, over the term of payments, a sum approximately equal to present value.

While there can be no absolute assurance that any stream of payments will, with certainty, place the recipient in the exact same position it would have been had a full cash payment initially been made, the Court must use its best judgment based upon all the factors presented to it to approximate as clearly as possible that result.

For this case, and at this time, I believe this formula accomplishes that result. Further, the formula has several advantages as a general guide. It provides some specific standards for the debtor and any one trying to calculate the exposure in financing a plan. For all concerned, it levels out short-term aberrations in the money market by initially averaging a six month prime rate variation rather than happenstance of any particular moment in time. Further, over the long-term (the debtor usually utilizes as much of the six years as possible), it can compensate for any temporary unrepresentative rate that may have existed, up or down, at the date of confirmation by continual six month adjustments.[30]

Yet for all its basic ease of calculation, it maintains ultimate flexibility. *In re Boston and Maine Corp.*, 719 F.2d 493, 496; 9 C.B.C.2d 1377, 1380 (1st Cir.1983). The Court, on a proper evidentiary presentation, can correct any major aberrations in the relationship between the § 6621 rate and the then market rate by adjustment of the 2.5% market rate equalization factor. All of this is done in a manner that seems in keeping with the Congressional intent of changing the absolute requirement of payment in full at confirmation under the Act to a potential six-year pay out as of right

under the Code, limited only by providing that the taxing authority would have a reasonable chance of receiving the present value of its forced loan by the application of and appropriate interest factor. Of course, it has been left to the courts to fashion the manner in which to determine an appropriate interest factor.

Accordingly, the Commonwealth's proof of claim is allowed in the principal amount of the tax claim plus interest at whatever the prevailing 26 U.S.C. § 6621 rate is at the time each payment is due plus 2.5%, all of which the Court believes provides the necessary present value, and the plan will be considered amended to so provide.

presented evidence that would have moved the Court to do so.

**30.** It may be suggested that the certainty of a fixed rate at confirmation is necessary rather than the envisioned variable rate. However, it has become standard commercial practice to base interest rates on variable rates, such as the

prime rate. Moreover, if the feasibility of any plan would come into question because of the utilization of a variable rather than a fixed rate on state taxes, the Court probably should have second thoughts about the feasibility of a debtor, in such a thin cash-flow position, having a confirmable plan.